IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KEVIN KENT HARMON, JR.,<br><br>    Plaintiff,<br><br>v.<br><br>UINTAH BASIN MEDICAL CENTER, NORTHEASTERN COUNSELING CENTER, and JASON SCOTT BEALES, M.D.,<br><br>    Defendant. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS**<br><br>Case No. 2:20-cv-00669-JNP-JCB<br><br>District Judge Jill N. Parrish |

Before the court are two Motions to Dismiss. The first is filed by Defendants Uintah Basin Medical Center ("UBMC") and Jason Scott Beales, M.D. ("Beales"). ECF No. 13. The second is filed by Defendant Northeastern Counseling Center ("Northeastern")[1] and incorporates by reference the Motion to Dismiss filed by UBMC and Beales. ECF No. 18. Having reviewed the memoranda[2], the court denies Defendants' Motions to Dismiss.

---

[1] Defendants UBMC, Beales, and Northeastern will be collectively referred to as "Defendants" in this Memorandum Decision and Order.

[2] The court also reviewed a Notice of Supplemental Authority Regarding Motions to Dismiss filed by Plaintiff (ECF No. 34) and a Response to Plaintiff's Statement of Supplemental Authorities: Motion to Dismiss filed by UBMC and Beales (ECF No. 35). In his Notice of Supplemental Authority, Plaintiff attaches copies of bills, a manual code list, and revenue codes and cites to Local Rules DUCivR 7-1 and DUCivR 56-1(e). ECF No. 34. However, it is not apparent that Plaintiff's attached documents are the kinds of supplemental "authorities" contemplated by DUCivR 7-1(b)(4). Additionally, Plaintiff's citation to DUCivR 56-1(e) is inapposite, as a motion for summary judgment is not before the court. Moreover, as explained further below, the issue that Plaintiff purports to address with these documents—whether Plaintiff was an outpatient held for

## BACKGROUND

On November 24, 2018, Plaintiff Kevin Kent Harmon, Jr. ("Plaintiff") presented to UBMC's hospital emergency department following a suicide attempt.[3] Plaintiff had attempted suicide earlier in the day and expressed that he was looking for other ways to kill himself. Plaintiff's attending physician on November 24 was Beales, an employee of UBMC. UBMC recognized that Plaintiff required greater psychiatric care than it could provide and arranged to transfer Plaintiff to the University Neuropsychiatric Institute of the University of Utah ("UNI") in Salt Lake County, Utah. Pending his transfer to UNI, Plaintiff was admitted to UBMC's hospital from November 24 to 25. UBMC's medical records for Plaintiff indicate that the reason for his admission was for "observation." Plaintiff's suicidal condition was never stabilized prior to his transfer to UNI.

Pursuant to UBMC's arrangements, Plaintiff was later transferred to UNI, approximately 160 miles away. Plaintiff was transferred by private vehicle. Plaintiff was not accompanied by a person who was trained or qualified to manage a suicidal patient, but rather by one able-bodied person, an 80-year-old woman, and a man who was and is paraplegic, none of whom had been instructed on how to deal with Plaintiff's condition. Plaintiff was not restrained during the transfer, nor was the private vehicle outfitted with means to do so. Plaintiff also was not sedated. During the transfer, Plaintiff again attempted suicide by jumping out of the private vehicle as it was

---

observation or an inpatient—is a factual dispute that this court cannot determine at the motion to dismiss stage.

[3] Plaintiff had previously been a patient of UBMC from November 19–20, 2018, also for having attempted suicide. Plaintiff alleges that his suicidal condition had worsened on November 24, 2018.

traveling on a highway at a speed of approximately 65 miles per hour. As a result of this suicide attempt, Plaintiff suffered several substantial injuries, including but not limited to a "[p]ermanent, severe and disabling traumatic brain injury"; "[m]ultiple skull fractures"; a concussion; "[d]iminished cognitive abilities"; "[m]emory and concentration defects"; and impaired vision, hearing, and ability to communicate. ECF No. 12 at 9.

Based upon the foregoing, Plaintiff asserts two causes of action against Defendants. First, Plaintiff sues UBMC under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. Second, Plaintiff sues all three Defendants for medical malpractice. Defendants move to dismiss Plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(6). Defendants argue that Plaintiff has failed to state a cause of action under EMTALA and that Plaintiff's remaining state law medical malpractice cause of action should accordingly be dismissed, as the court only has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367. Plaintiff "agrees that *if* its EMTALA claim were dismissed, then the malpractice claim would be outside this court's jurisdiction." ECF No. 26 at 2.

## LEGAL STANDARD

Dismissal of a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure is appropriate where the plaintiff fails to "state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss for failure to state a claim, a court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013) (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The complaint must allege more

than labels or legal conclusions and its factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## DISCUSSION

**I.      EMTALA Cause of Action**

    A.      Statutory Standards

        1)  Purpose and Scope

"Congress enacted EMTALA in 1986 to address the problem of 'dumping' patients in need of medical care but without health insurance." *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 796 (10th Cir. 2001) (citations omitted). Despite this specific purpose, EMTALA "appl[ies] equally to all individuals whether or not they are insured." *Id.* (citations omitted). To ensure compliance with EMTALA, Congress included a civil enforcement provision that permits individuals who suffer "personal harm as a direct result of a participating hospital's violation of" its provisions to bring a civil action against the hospital to "obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate." 42 U.S.C. § 1395dd(d)(2)(A); *Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519, 521–22 (10th Cir. 1994).[4]

The Tenth Circuit has recognized EMTALA's "limited reach and purpose": "EMTALA does not set a federal standard of care or replace pre-existing state medical negligence laws." *Phillips*, 244 F.3d at 798 (citations omitted); *see also St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs.*, 309 F.3d 680, 694 (10th Cir. 2002) ("EMTALA's beneficent purpose should not obscure its inherent limitations. Section 1395dd is an anti-dumping provision, not a federal medical

---

[4] "The term 'participating hospital' means a hospital that has entered into a provider agreement under section 1395cc of this title." 42 U.S.C. § 1395dd(e)(2).

malpractice law." (citations omitted)); 42 U.S.C. § 1395dd(f) ("The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section."). Accordingly, EMTALA provides no remedy for an "inadequate or inaccurate diagnosis." *Phillips*, 244 F.3d at 798 (citation omitted).

    2) Requirements

EMTALA applies to any hospital that has an emergency department and receives Medicare payments. *Abercrombie v. Osteopathic Hosp. Founders Ass'n*, 950 F.2d 676, 680 (10th Cir. 1991). EMTALA imposes "two primary obligations" on participating hospitals. *Phillips*, 244 F.3d at 796 (citation omitted). First, if an individual comes to such hospital's emergency department requesting examination and treatment for a medical condition, then the hospital has a duty to "provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. § 1395dd(a).[5] Second, if an emergency medical condition exists, the hospital must provide either:

> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

---

[5] As defined by the statute and relevant here, an "emergency medical condition" means the following:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--
>> (i) placing the health of the individual . . . in serious jeopardy,
>> (ii) serious impairment to bodily functions, or
>> (iii) serious dysfunction of any bodily organ or part.

42 U.S.C. § 1395dd(e)(1).

5

> (B) for transfer of the individual to another medical facility in accordance with subsection (c).

*Id.* § 1395dd(b)(1).[6] "Transfer" includes discharging the patient and moving the patient to another facility. *Id.* § 1395dd(e)(4). Subsection (c) provides that a transfer of an individual with a condition which has not been stabilized must be "an appropriate transfer." *Id.* § 1395dd(c)(1)(B). As relevant here, an "appropriate transfer" requires the transferring hospital to "provide[] the medical treatment within its capacity which minimizes the risks to the individual's health,"[7] and "is effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer." *Id.* § 1395dd(c)(2)(A), (D).

Subsections (a) and (c) impose strict liability on hospitals. *Abercrombie*, 950 F.2d at 681. A plaintiff may prevail under EMTALA "by showing violations of either § 1395dd(a) or § 1395dd(c); plaintiffs need not show a violation of both subsections." *Urban ex rel. Urban v. King*, 43 F.3d 523, 525 (10th Cir. 1994) (citation omitted). Additionally, to succeed on a claim under § 1395dd(c), a plaintiff must "prove as a condition" that "the hospital had actual knowledge of the patient's emergency medical condition." *Id.* at 527.

---

[6] "To stabilize" within the meaning of EMTALA means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). "Stabilized" means "that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility." *Id.* § 1395dd(e)(3)(B).

[7] The Tenth Circuit has interpreted § 1395dd(c)(2)(A) narrowly to mean that a hospital's "capacity to provide medical treatment to minimize the risks of transfer should be measured by [the hospital's] standard practices," so as to serve EMTALA's limited purpose and not "federalize medical malpractice." *See Ingram v. Muskogee Reg'l Med. Ctr.*, 235 F.3d 550, 552 (10th Cir. 2000) (citation omitted).

B.  Interpretive Regulations

In addition to EMTALA's statutory provisions, federal regulations interpreting EMTALA, promulgated by the Department of Health and Human Services' Centers for Medicare and Medicaid Services (the "CMS regulations"), provide guidance for evaluating an EMTALA claim. *See, e.g.*, *St. Anthony*, 309 F.3d at 705 (citing the CMS regulations in evaluating an EMTALA claim); *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 893–96 (7th Cir. 2003) (referring to the CMS regulations for guidance in evaluating an EMTALA claim); *Torretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 174 (3d Cir. 2009) (stating that "CMS has the congressional authority to promulgate rules and regulations interpreting and implementing Medicare-related statutes such as EMTALA," and observing that "[g]enerally, we defer to a government agency's administrative interpretation of a statute unless it is contrary to clear congressional intent" (citations omitted)); *Thornhill v. Jackson Parish Hosp.*, 184 F. Supp. 3d 392, 399 (W.D. La. 2016) ("The vast majority of courts that have considered a hospital's duty under EMTALA since CMS promulgated the regulations have given the regulations controlling weight, or have cited them in support . . . ."). *But see, e.g.*, *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 583 (6th Cir. 2009) (refusing to defer to a provision of the CMS regulations upon finding it "contrary" to the plain text of EMTALA). The CMS regulations clarify that "emergency medical condition" includes "psychiatric disturbances." 42 C.F.R. 489.24(b)(1); *see also Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1257–59 (9th Cir. 1995) (applying EMTALA to a psychiatric condition). Here, both parties cite and rely upon the CMS regulations in their briefing, and neither argues that the court should not do the same. The court therefore regards the CMS regulations as instructive here.

1) Inpatient Admission Exception

Although the text of EMTALA is unclear regarding whether admitting a patient for observation terminates a participating hospital's liability under the statute, the CMS regulations provide guidance on this subject. The CMS regulations expressly state that if an individual is determined to have an emergency medical condition, and "[i]f the hospital admits the individual *as an inpatient* for further treatment, the hospital's obligation under this section ends, as specified in paragraph (d)(2) of this section" 42 C.F.R. § 489.24(a)(1)(ii) (emphasis added). Subsection (d)(2) in turn provides that "[i]f a hospital has screened an individual under paragraph (a) of this section and found the individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities under this section with respect to that individual." *Id.* § 489.24(d)(2)(i).

The Supreme Court has held that courts must "give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citations omitted). Indeed, "the agency's interpretation must be given '"controlling weight unless it is plainly erroneous or inconsistent with the regulation."'" *Id.* (citation omitted). An examination of CMS's 2003 Final Rule further clarifies that CMS interprets "hospital obligations under EMTALA as ending once the individuals *are admitted to the hospital inpatient care*." Medicare Program; Clarifying Policies Related to the Responsibilities of Medicare-Participating Hospitals in Treating Individuals With Emergency Medical Conditions, 68 Fed. Reg. 53,222, 53,245 (Sept.

9, 2003) (emphasis added).[8] The court does not find that this interpretation is "plainly erroneous or inconsistent with the regulation," *see Thomas Jefferson*, 512 U.S. at 512; indeed, this interpretation appears to be entirely consistent with the regulation, and the parties raise no argument to the contrary. Accordingly, the court will give this interpretation substantial deference.

Further, in line with CMS regulations, some circuits have held that admitting a patient for inpatient care cuts off a hospital's liability under EMTALA. *See, e.g.*, *Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1167 (9th Cir. 2002) ("We hold that the stabilization requirement normally ends when a patient is admitted for inpatient care."); *Bryan v. Rectors & Visitors of Univ. of Va.*, 95 F.3d 349, 350 (4th Cir. 1996) ("[The plaintiff's] essential contention is that EMTALA imposed upon the hospital an obligation not only to admit [the patient] for treatment of her emergency condition, which concededly was done, but thereafter continuously to 'stabilize' her condition, no matter how long treatment was required to maintain that condition. Such a theory requires a reading of the critical stabilization requirement in subsection (b)(1) of EMTALA that we cannot accept."). *But see, e.g.*, *Moses*, 561 F.3d at 583 ("[A] hospital may not release a patient with an emergency medical condition *without first determining that the patient has actually stabilized,* even if the hospital properly admitted the patient.").

---

[8] CMS's 2008 Final Rule maintains this EMTALA exception for patients admitted for inpatient care. *See* Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2009 Rates; Payments for Graduate Medical Education in Certain Emergency Situations; Changes to Disclosure of Physician Ownership in Hospitals and Physician Self-Referral Rules; Updates to the Long-Term Care Prospective Payment System; Updates to Certain IPPS-Excluded Hospitals; and Collection of Information Regarding Financial Relationships Between Hospitals, 73 Fed. Reg. 48,434, 48,661 (Aug. 19, 2008) ("[W]e are clarifying the EMTALA regulations at § 489.24(f) with respect to hospital inpatients by stating that once an individual is admitted in good faith by the admitting hospital, the admitting hospital has satisfied its EMTALA obligation with respect to that individual . . . .").

2) Observation Admission Exemption

Subsequent guidance from CMS clarifies, however, that admitting a patient for "observation" does not satisfy the inpatient admission exception to EMTALA: "Individuals who are placed in observation status are not inpatients, even if they occupy a bed overnight. Therefore, *placement in an observation status of an individual . . . does not terminate the EMTALA obligations of that hospital* or a recipient hospital toward the individual." Ctrs. for Medicare & Medicaid Servs., S & C-09-26, Inpatient Prospective Payment System (IPPS) 2009 Final Rule Revisions to Emergency Medical Treatment and Labor Act (EMTALA) Regulations (Mar. 6, 2009), https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertification GenInfo/Downloads/SCLetter09-26.pdf (emphasis added).

The court's research yielded one case that extensively interpreted the applicability of EMTALA to patients admitted for observation and held that observation admission—in contrast to inpatient admission—does not terminate a participating hospital's EMTALA obligations. *Dicioccio v. Chung*, 232 F. Supp. 3d 681, 686–91 (E.D. Pa. 2017). The court's research also yielded *Crawford v. Kaiser Foundation Health Plan*, 395 F. Supp. 3d 1279, 1286–90 (N.D. Cal. 2019), in which a court found that the parties' dispute as to whether a patient was admitted as an observation patient or as an inpatient was "a factual dispute that the court [could not] decide on a motion to dismiss." Although the plaintiff in *Crawford* argued that she was admitted only as an observation patient and thus the hospital had a continuing duty to her under EMTALA, in denying the hospital's motion to dismiss, the court found that the hospital "fail[ed] to address squarely whether admission for observation ends EMTALA's stabilization requirement in the same way that admission for inpatient care does." *Id.* at 1290.

C. Plaintiff's EMTALA Claim

Here, it is undisputed that UBMC is a participating hospital subject to the provisions of EMTALA. It is also undisputed that on November 24, 2018, Plaintiff suffered from an emergency medical condition of which the hospital had knowledge. Plaintiff does not allege an EMTALA claim based on UBMC's failure to provide him with an "appropriate medical screening." Rather, Plaintiff's EMTALA claim rests on UBMC's alleged failure to stabilize or appropriately transfer him to another medical facility. The court evaluates Plaintiff's EMTALA claim for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

1) Conversion of the Motions to Dismiss into Motions for Summary Judgment

As a preliminary matter, the court first addresses whether Defendants' reliance upon Plaintiff's UBMC hospital records in their Motions to Dismiss requires this court to treat their Motions to Dismiss as motions for summary judgment. Plaintiff characterizes Defendants' Motions to Dismiss as "an improper pre-discovery Motion for Summary Judgment" because of Defendants' attachment of and reliance upon these record excerpts. ECF No. 26 at 2.

It is well-established that "[a] 12(b)(6) motion must be converted to a motion for summary judgment if 'matters outside the pleading are presented to and not excluded by the court' and 'all parties . . . [are] given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.'" *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) (citation omitted); *see also* FED. R. CIV. P. 12(d). Nevertheless, "if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." *GFF Corp.*, 130 F.3d at 1384

11

(citations omitted). In such a circumstance, "the plaintiff is obviously on notice of the document's contents, and th[e] rationale for conversion to summary judgment dissipates." *Id.* at 1385.

Here, the court declines to convert Defendants' Motions to Dismiss into motions for summary judgment. Defendants attach to their Motions to Dismiss and discuss at length the contents of documents other than the Complaint (i.e., excerpts from Plaintiff's UBMC hospital records). Plaintiff did not incorporate the UBMC hospital records by reference in his Complaint. But Plaintiff refers to his UBMC hospital records in his Complaint, and the records appear to be central to his claim, as they communicate his admission status and treatment received while at UBMC—issues that are heavily contested by the parties as they relate to Plaintiff's EMTALA claim. Plaintiff also does not dispute Defendants' assertion that these records are central to his EMTALA claim or the authenticity of the attached records. Accordingly, the court finds that Plaintiff is "obviously on notice of the document's contents," *GFF Corp.*, 130 F.3d at 1385, and that Defendants' reliance upon these hospital records does not transform their motions for dismissal into ones for summary judgment.

2) UBMC's Failure to Stabilize or Perform an Appropriate Transfer

Defendants' principal argument in favor of dismissal of Plaintiff's EMTALA claim is that Plaintiff was admitted to UBMC "in good faith for inpatient treatment," at which point UBMC's EMTALA obligations were satisfied. ECF No. 13 at 2.[9] Thus, Defendants argue that any

---

[9] Defendants specifically argue that UBMC's admission of Plaintiff to obtain a consultation from Northeastern satisfies the inpatient admission exception, but they cite no binding authority for this position. Defendants cite 42 C.F.R. § 489.24(d)(2) and 42 U.S.C. § 1395dd(b), but neither provision states that a participating hospital's referral to a specialist satisfies the hospital's EMTALA obligations by constituting "admit[ting] that individual as an inpatient in good faith in order to stabilize the emergency medical condition," or "such further medical examination and such treatment as may be required to stabilize the medical condition," respectively.

occurrences following Plaintiff's November 24–25, 2018 admission to UBMC may be redressable under state medical malpractice law but are not redressable under EMTALA. In support of their position that Plaintiff was admitted for inpatient care, Defendants cite various portions of Plaintiff's UBMC hospital records. These records reflect the treatments ordered for and received by Plaintiff following his admission to UBMC, including a mental health evaluation performed by Northeastern and the ongoing placement of a peripheral IV. The records also state that Plaintiff was admitted to UBMC's ICU "for further evaluation and treatment." ECF No. 13-1 at 2. Plaintiff alleges in his Complaint that he was categorized as an "observation" patient and that the "reason for admission" was "observation." ECF No. 12 ¶ 25. Plaintiff responds to Defendants' argument

---

Defendants also cite *Morgan v. North Mississippi Medical Center, Inc.*, 458 F. Supp. 2d 1341 (S.D. Ala. 2006) for the proposition that "a hospital's referral to a specialist satisfie[s] its requirements under EMTALA." ECF Nos. 13 at 9, 30 at 4. But not only is *Morgan* not binding on this court, the case is also readily distinguishable, both with respect to its procedural posture and factual basis. First, the case was decided at the summary judgment stage. This matter is currently at the motion to dismiss stage. As stated below, the court finds that whether UBMC's admission of Plaintiff constituted an inpatient admission that satisfied UBMC's EMTALA obligations or an observation admission that did not satisfy UBMC's EMTALA obligations is a factual dispute that the court cannot determine at the motion to dismiss stage. *Crawford*, 395 F. Supp. 3d at 1290. Second, Plaintiff was only admitted to UBMC for one day and received a consultation with a mental health care specialist and an ongoing placement of a peripheral IV. By contrast, the patient in *Morgan* was admitted to the hospital for nine days and received a comparatively more rigorous "regimen of diagnosis, treatment, therapy, and pain management" in which the hospital:

> administered pain medication; took numerous CT scans and x-rays; performed procedures to relocate his shoulder; administered physical therapy; furnished consultations from a pain specialist, a neurosurgeon and an orthopedist; provided respiratory and occupational therapy; administered oxygen; provided an epidural steroid injection to relieve back pain; and recommended that [the patient] submit to an MRI for further investigation of his back.

458 F. Supp. 2d at 1356. Based upon the foregoing, the court further finds that *Morgan* does not, as Defendants seem to imply, stand for the proposition that referral to a specialist alone satisfies a hospital's EMTALA obligations, and the court does not find *Morgan* to be persuasive here.

by citing other portions of his hospital records that state that he was admitted to UBMC's ICU for "observation" and "close monitoring" (ECF No. 26 at 27–30), that his "Reason for Admission" was "Observation" (*id.* at 31), and that his ICU admission order was that he be "Place[d] in Observation" (*id.* at 32). Thus, Plaintiff argues that he was admitted to UBMC's ICU for observation purposes, rather than for inpatient care, which does not discharge UBMC's EMTALA obligations.

Whether Plaintiff was admitted as an observation patient or as an inpatient is "a factual dispute that the court cannot decide on a motion to dismiss." *Crawford*, 395 F. Supp. 3d at 1290. Further, Defendants do not otherwise argue or provide binding authority to support that UBMC's conduct stabilized Plaintiff's emergency medical condition within the meaning of EMTALA. To the contrary, Plaintiff alleges that his emergency medical condition "was never stabilized at UBMC's hospital," and that "UBMC recognized and realized on November 24, 2018 that Plaintiff's suicidal condition had worsened . . . [and] that UBMC would not be able to stabilize Plaintiff's mental emergency medical condition." ECF No. 12 ¶¶ 23–24.[10] And because Plaintiff alleges that his emergency medical condition was not stabilized at UBMC, UBMC was then under a duty pursuant to EMTALA to affect an "appropriate transfer" of Plaintiff to another medical facility. *See* 42 U.S.C. § 1395dd(b)(1)(B), (c)(1)(B). Plaintiff alleges that his transfer was not "appropriate" under EMTALA because it was not "effected through qualified personnel and

---

[10] The court also notes that the UBMC hospital records that Plaintiff attached to his response memorandum acknowledge Plaintiff's "still current unstable mental status" following Plaintiff's consultation with Northeastern. ECF No. 26 at 36. The records also indicate that Plaintiff "continue[d] to be agitated," "continue[d] to also have suicidal ideation and what appears to be some active paranoia or psychoses," and "was not considered stable to be discharged home with a safety plan and outpatient followup [*sic*]." *Id.* at 33, 35–36.

transportation equipment," *see id.* § 1395dd(c)(2)(D), since it was performed with a private vehicle without the capacity to restrain Plaintiff, Plaintiff was unrestrained and not sedated in the vehicle, and the only individuals who accompanied Plaintiff in the vehicle were untrained and/or physically incapable of handling a suicidal patient. ECF No. 12 ¶¶ 27–31, 33–34. Defendants' only argument with respect to the appropriateness of Plaintiff's transfer to UNI is that EMTALA does not provide a remedy for allegations related to the standard of care afforded to a patient; such allegations are to be addressed under a medical malpractice claim. But Defendants' argument ignores EMTALA's express provisions requiring an "appropriate transfer." *See* 42 U.S.C. § 1395dd(c)(2). And, as stated above, the court cannot decide at this stage whether UBMC's EMTALA obligations were satisfied by his admission to UBMC's ICU prior to his transfer to UNI.

Accordingly, the court finds that Plaintiff has alleged sufficient facts to establish that he had an emergency medical condition upon presentation to UBMC on November 24, 2018, that his condition was not stabilized during his time at UBMC from November 24–25, 2018, and that UBMC failed to perform an appropriate transfer of Plaintiff to UNI. These allegations are not made in a conclusory fashion and accordingly state a cause of action against UBMC for violation of EMTALA.

## II.  State Law Medical Malpractice Cause of Action

Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." "Once federal question jurisdiction exists, it is within the trial court's discretion to exercise supplemental jurisdiction over those state law claims that derive from a common nucleus of facts." *United Int'l Holdings, Inc. v.*

*Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1220 (10th Cir. 2000) (citation omitted). A district court may decline to exercise supplemental jurisdiction over such state law claims if it "dismisse[s] all claims over which it ha[d] original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."), *superseded on other grounds by* 28 U.S.C. § 1447(c).

Here, the court has original jurisdiction over Plaintiff's EMTALA claim under 28 U.S.C. § 1331. Plaintiff alleges that the court has supplemental jurisdiction over his state law medical malpractice cause of action under 28 U.S.C. § 1367, as it "involves the same facts, case and controversy as Plaintiff's EMTALA cause of action." ECF No. 12 ¶ 49. Both parties agree that this court should decline to exercise supplemental jurisdiction over Plaintiff's state law medical malpractice claim if it dismisses Plaintiff's EMTALA claim. However, because Plaintiff has plausibly pleaded an EMTALA claim and sufficiently alleged that his state law medical malpractice claim arises from the same facts as his EMTALA claim, the court will continue to exercise supplemental jurisdiction over Plaintiff's state law medical malpractice claim.

## CONCLUSION AND ORDER

The court finds that Plaintiff has plausibly and sufficiently alleged an EMTALA claim. Accordingly, Defendants' Motions to Dismiss (ECF Nos. 13, 18) are hereby DENIED.

DATED June 21, 2021.

                                         BY THE COURT

                                         _____
                                         Jill N. Parrish
                                         United States District Court Judge