IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KEVIN KENT HARMON, JR, <br><br> Plaintiff, <br><br> v. <br><br> UINTAH BASIN MEDICAL CENTER, NORTHEASTERN COUNSELING CENTER, and JASON SCOTT BEALES, M.D. <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 2:20-cv-00669-JNP-CMR <br><br> District Judge Jill N. Parrish <br><br> Magistrate Judge Cecilia M. Romero |

Before the court is Defendants' partial motion for summary judgment. ECF No. 114 ("Defs.' Mot."). Plaintiff Kevin Kent Harmon, Jr. ("Plaintiff") filed this action against Defendants Uintah Basin Medical Center ("UBMC"), Northeastern Counseling Center, and Jason Scott Beales, M.D. ("Dr. Beales") (collectively, "Defendants") alleging claims under the Emergency Medical Treatment and Active Labor Act ("EMTALA" or "the Act") and state medical malpractice law. ECF No. 2 ("Pl.'s Compl.").

In 2020, Defendants moved to dismiss this action. ECF Nos. 13, 18. The court denied that motion, holding that whether Plaintiff was admitted as an observation patient or inpatient is a factual dispute that the court could not decide on a motion to dismiss. ECF No. 38. Defendants UBMC and Dr. Beales then moved for partial summary judgment on Plaintiff's EMTALA claim, arguing that there is no dispute of fact that Plaintiff was admitted as an inpatient thus relieving Defendants of their EMTALA obligations. For the following reasons, the court **DENIES** Defendants' Motion because there remains a dispute of fact as to whether Defendants stabilized Plaintiff within the meaning of EMTALA.

## BACKGROUND

On November 24, 2018, Plaintiff presented to the emergency department at UBMC after ingesting bleach in a suicide attempt. Upon his arrival, emergency personnel performed a triage assessment and initiated suicide precautions. Although medical records do not indicate exactly what these precautions entailed, Plaintiff's medical expert, Dr. Bernard Dannenberg, testified in his deposition that suicide precautions typically include assigning someone to constantly watch the patient, searching for weapons, and removing any objects that could be used for self-harm such as belts and shoelaces. ECF No. 114-1, Exhibit C ("Dannenberg Deposition") at 40:23-41:11. In the emergency room, UBMC staff administered IV fluids and Zofran to treat Plaintiff's bleach ingestion and contacted poison control who recommended Plaintiff complete a "by-mouth challenge."[1]

After emergency personnel medically stabilized Plaintiff, UBMC transferred him to the intensive care unit ("ICU") for observation and close monitoring overnight. Plaintiff's medical records documenting his ICU stay indicate "Patient Type: Observation." ECF No. 116-1, Exhibit 2 ("Medical Records") at 1. And Dr. Dannenberg testified in his deposition that Plaintiff was placed in "observation status" as opposed to "inpatient." Dannenberg Deposition at 63:6-20. While in the ICU, Plaintiff was placed directly in front of the nursing station to ensure continuous monitoring to prevent self-harm. At some point that evening, Dr. Beales examined Plaintiff and then ordered him an age-appropriate diet and requested a mental health examination

---

[1] Dr. Dannenberg stated that a patient passes a "by mouth challenge" when he "take[s] something through [his] mouth, drink . . . to see if the patient can control fluids." Dannenberg Deposition at 44:15-18. This is used to clear the patient from a medical standpoint. *See id.*

by Northeastern Counseling. Plaintiff also ate and drank while in the ICU, thereby passing a "by-mouth challenge."

The next morning, two mental health providers from Northeastern Counseling Center assessed Plaintiff and recommended inpatient mental health treatment at the University Neuropsychiatric Institute of the University of Utah ("UNI"). UBMC then arranged for Plaintiff's transfer to UNI. At this point, Plaintiff had been cleared from a medical standpoint for bleach ingestion. But given Plaintiff's mental state and history of suicide attempts, he was not considered stable for discharge to home or outpatient care.

Plaintiff's family requested he be transferred to UNI in a private vehicle, which Defendants approved. Plaintiff's father, a paraplegic, his 80-year-old grandmother and uncle accompanied Plaintiff on the approximately 140-mile transfer. During the transport, Plaintiff attempted suicide again by throwing himself out of the car at a speed of 65 miles per hour. As a result, Plaintiff suffered life-threatening injuries and permanently diminished mental and physical capabilities.

## LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is material only if it might affect the outcome of the suit under the governing law. And a dispute over a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1186 (10th Cir. 2016).

Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When applying the summary-judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008). The court must grant summary judgment on a claim if the party bearing the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

## ANALYSIS

Defendants move for summary judgment on Plaintiff's EMTALA claim, arguing that there is no genuine dispute of fact that Plaintiff's emergency medical conditions were stabilized prior to his transfer to UNI. Defendants assert two arguments: (1) Plaintiff was admitted as an inpatient, thereby exempting them from EMTALA liability and (2) Plaintiff's emergency medical condition was stabilized prior to his transfer to UNI.

### I.     EMTALA OBLIGATIONS

Congress enacted EMTALA "to address the problem of dumping patients in need of medical care but without health insurance." *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 796 (10th Cir. 2001). However, EMTALA applies regardless of whether a patient has health insurance. *See id.* The Act imposes two primary obligations. "First, the hospital must conduct an initial medical examination to determine whether the patient is suffering from an emergency medical condition." *Id.* Second, if an emergency condition exists, the hospital must "stabilize the patient before transporting him or her elsewhere." *Id.* Plaintiff argues that Defendants violated EMTALA by failing to comply with the second obligation.

To comply with the second EMTALA obligation, federal regulations require the hospital to either "provide any necessary stabilizing treatment . . . or an appropriate transfer . . . ." 42 C.F.R. § 489.24(a)(1)(ii). But "[i]f the hospital admits the individual as an inpatient for further treatment, the hospital's obligation under this section ends . . . ." *Id.*; *see also Bryant v. Adventists Health Sys./West*, 289 F.3d 1162, 1168 (9th Cir. 2002) ("EMTALA's stabilization requirement ends when an individual is admitted for inpatient care.").

To qualify for this safe harbor, the hospital must admit the patient "in good faith." *Id.* § 489.24(d)(2)(i). And, according to interpretive guidance from the Centers for Medicare and Medicaid ("CMS"), the agency authorized to promulgate EMTALA implementing regulations, this safe harbor applies "whether or not the individual has been stabilized." ECF No. 114-1, Exhibit A ("CMS Guidance") at 57. In *Bryant*, the Ninth Circuit explained the purpose of the inpatient safe harbor:

> Congress enacted EMTALA to create a new cause of action, generally unavailable under state tort law, for what amounts to failure to treat and not to duplicate preexisting legal protections. After an individual is admitted for inpatient care, state tort law provides a remedy for negligent care. If EMTALA liability extended to inpatient care, EMTALA would be converted . . . into a federal malpractice statute, something it was never intended to be.

*Bryant*, 289 F.3d at 1168-69. Thus, EMTALA liability ends once a hospital has admitted an individual as an inpatient, leaving state medical malpractice as the proper remedy.

### A.   Whether Plaintiff was admitted as an inpatient

Defendants argue that this safe harbor applies to them because UBMC admitted Plaintiff as an inpatient. Plaintiff responds that he was never admitted as an inpatient, but rather only kept in the ICU on "observation status," as noted in his medical records. In arguing that Plaintiff was in fact admitted as an inpatient, Defendants cite 42 C.F.R. § 489.24(b), which defines inpatient as

5

> an individual who is admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services as described in § 409.10(a) of this chapter with the expectation that he or she will remain at least overnight and occupy a bed even though the situation later develops that the individual can be discharged or transferred to another hospital and does not actually use a hospital bed overnight.

Hospital services described in Section 409.10(a) include "[b]ed and board," "[n]ursing services and other related services," "[u]se of hospital [] facilities," "[m]edical social services," "[d]rugs, biologicals, supplies, appliances, and equipment," and "[c]ertain other diagnostic or therapeutic services." *Id.* § 489.24(d)(2)(i).

There is no dispute Plaintiff received some of the services described in Section 409.10(a). After all, he received bed and board, nursing services, IV fluids, and anti-nausea drugs. But just because Plaintiff received these services does not necessarily mean he was admitted as an inpatient. Section 489.24(b) defines inpatient as an individual who is *admitted* to a hospital for purposes of receiving the kinds of services described in Section 409.10(a). It does not define inpatient as someone who receives those services. Therefore, Defendant must show that Plaintiff was in fact admitted as an inpatient for the purpose of receiving inpatient services, not solely kept in the ICU for observation prior to his transfer to UNI.

In arguing that observation status does not amount to status as an inpatient, Plaintiff points to CMS interpretive guidance, which states that "[i]ndividuals who are placed in observation status are not inpatients, even if they occupy a bed overnight. Therefore, placement in an observation status of an individual . . . does not terminate the EMTALA obligations of that hospital or a recipient hospital toward the individual." CMS Guidance at 69. Defendants respond that this provision does not apply to them because it is situated within the agency's interpretation of Section 489.24(f), which concerns recipient hospitals with specialized capabilities or facilities.

6

*See id.* at 21-23. Indeed, UBMC is not a recipient hospital with specialized capabilities and Subsection (f) generally does not apply to it. But the provision read in context is providing guidance on Section 289.24(b), which defines inpatient and *is* applicable to UBMC.[2] Therefore, the court finds this interpretation of inpatient regarding observation status to be relevant here. *See Auer v. Robbins*, 519 U.S. 452, 463 (1997) (holding that courts give deference to an agency's reasonable interpretation of its own regulations).

The agency's responses to comments in the 2003 Final Rule implementing EMTALA regulations also provide some insight into whether a patient has been admitted as an inpatient. Here, the agency explains the reason for the exception: "[S]hould a hospital determine that it would be better to admit the individual as an inpatient, such a decision would not result in either a transfer or a discharge, and, consequently, the hospital would not have an obligation to stabilize under EMTALA." Medicare Program; Clarifying Policies Related to the Responsibilities of Medicare-Participating Hospitals in Treating Individuals With Emergency Medical Conditions, 68 Fed. Reg. 53,222, 53,244 (Sept. 9, 2003). Because the agency intended this exception to provide protection for hospitals who would not need to transfer or discharge a patient, it is evident why a patient in observation status would not fall under this safe harbor. As the *Dicioccio* court noted,

> observation status is not the same as inpatient admission, but is used to determine whether a patient should be admitted for further treatment or discharged. In other words, observation is sometimes necessary in order to identify whether a hospital would be violating EMTALA by releasing or transferring a particular patient. Holding that admission for observation bars EMTALA liability would thus

---

[2] The court in *Dicioccio v. Chung* also applied this provision regarding observation status to an emergency department defendant not subject to Subsection (f). 232 F.Supp.3d 681 (E.D.P.A. 2017).

> create an end-run around the statute by allowing hospitals to place patients in a limbo-like observation status without stabilizing them, secure in the knowledge that they could discharge the patient at any point, regardless of their condition, without incurring EMTALA liability. This would condone, if not encourage, the practice of patient dumping that EMTALA was designed to prevent.

*Dicioccio*, 232 F.Supp.3d at 690 (internal quotation marks omitted).

In viewing the facts in the light most favorable to Plaintiff, a dispute of fact remains as to whether Plaintiff was admitted as an inpatient or placed in observation status. Plaintiff's medical records indicate his status was "observation," and Dr. Dannenberg opined that UBMC never admitted Plaintiff as an inpatient. The court thus turns to whether Plaintiff was stabilized prior to his transfer to UNI.

### B.     Whether Plaintiff was stabilized prior to transfer

Defendants argue that even if Plaintiff was not admitted as an inpatient, there is no dispute of fact that Plaintiff was stabilized within the meaning of EMTALA. "If a hospital is alleged to have violated EMTALA by transferring an unstable individual without implementing an appropriate transfer according to §489.24(e), and the hospital believes that the individual was stable . . . the burden of proof is the responsibility of the transferring hospital." CMS Guidance at 55. According to federal regulations, an emergency medical condition is stabilized when "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility . . . ." 42 C.F.R. § 489.24(b).

To demonstrate Plaintiff was stable, Defendants cite agency guidance providing that "psychiatric patients are considered stable when they are protected and prevented from injuring or harming him/herself or others." CMS Guidance at 55. Defendants initiated suicide precautions while Plaintiff was in the emergency department and then continued these precautions by placing

him in the direct line of sight of the nursing station after he was transferred to the ICU. Defendants claim that at this point, Plaintiff was "stabilized" as he was undeniably protected and prevented from injuring or harming himself while he was in the emergency department and ICU.

But in reading the sentences following the provision cited by Defendants, it is not clear that determining whether a patient is stabilized is so straightforward:

> The administration of chemical or physical restraints for purposes of transferring an individual from one facility to another may stabilize a psychiatric patient for a period of time and remove the immediate [emergency medical condition] but the underlying medical condition may persist and if not treated for longevity the patient may experience exacerbation of the [emergency medical condition]. Therefore, practitioners should use great care when determining if the medical condition is in fact stable after administering chemical or physical restraints.

*Id.* The fact that CMS warned practitioners to "use great care when determining if the medical condition is in fact stable after administering chemical or physical restraints" suggests that even if a hospital stabilizes a patient for a period of time, there is still an EMTALA obligation to ensure that the patient remains stable prior to a transfer. The stabilization requirement is ongoing until the hospital has either stabilized the patient, properly transferred the patient, or admitted the patient as an inpatient. And CMS guidance supports this interpretation, affirming that "[a] hospital's EMTALA obligation ends when a physician or qualified medical person" determines that (1) "no emergency medical condition exists (even though the underlying medical condition may persist," (2) "an emergency medical condition exists and the individual is appropriately transferred to another facility" or (3) "an emergency medical condition exists and the individual is admitted to the hospital for further stabilizing treatment." *Id.* at 56.

Defendants argue that Plaintiff falls into the first category, no emergency medical condition existed even though Plaintiff's underlying mental health issues continued to persist.

9

Plaintiff responds that he was never stabilized, and his emergency medical condition continued to exist because he was actively suicidal despite being prevented from self-harm while in the emergency department and ICU. Indeed, Plaintiff's expert, Dr. Dannenberg, opined that Plaintiff's psychological emergency medical condition was never stabilized. And Plaintiff's attempt to take his own life as soon as he was able indicates that his emergency medical condition was not stabilized but merely kept at bay until he had the opportunity to act. As accounted for in the CMS guidance, Plaintiff was physically restrained from self-harm while he was in the emergency department and ICU. But once those restraints were removed, he attempted to jump out of a moving vehicle on the highway at 65 mph. Thus, the court finds that there remains a dispute of fact as to whether Plaintiff was stabilized as required by EMTALA prior to his transfer to UNI.

## CONCLUSION AND ORDER

For the reasons set forth above, the court **DENIES** Defendants' partial motion for summary judgment on Plaintiff's EMTALA claim. ECF No. 114.

DATED March 18, 2025

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge